Rickey B. and Brenda S. BRYANT, individually and as Guardians ad Litem for Chrystal R. and Stephanie Windham Bryant, minors under the age of 17), and Bonny L. Arnold, Stephen L. Bannister, Genevie W. Bannister, Kenneth R. Barney, Clifford Clark, Elizabeth Anne Daniel, William C. Flockhart, Paul B. Hawkins, Donald T. Maloney, Pamela K. Maloney, John Mawyer, Carol S. Mawyer and Scottie Neal Philbeck, and on behalf of all others similarly situated, Plaintiffs,

v.

FOOD LION INC.; Profit–Sharing Retirement Plan of Food Lion, Inc., The Food Lion, Inc. Group Benefit Plan, Ralph W. Ketner, Tom E. Smith, and Eugene R. McKinley, Defendants.

No. Civ.A. 2:90–0505–11.

United States District Court,
D. South Carolina,
Charleston Division.

May 26, 2000.

See also 774 F.Supp. 1484.

Nicholas W. Clark, Assistant General Counsel, Peter J. Ford, UFCW, Legal Department, Washington, DC, Ian Lanoff, Julia Penny Clark, Bredhoff & Kaiser, Washington, DC, James Lee Bell, The Bell Law Firm, PA, Charleston, SC, for Rickey B. Bryant, Brenda S. Bryant, Chrystal R. Bryant, Stephanie Windham Bryant.

Nicholas W. Clark, Assistant General Counsel, Peter J. Ford, UFCW, Legal Department, Washington, DC, Ian Lanoff,

Julia Penny Clark, Bredhoff & Kaiser, Washington, DC, for Stephen L. Bannister, Genevie W. Bannister, Scottie Neal Philbeck.

Celeste Tiller Jones, Charles S. Porter, Jr., Jane W. Trinkley, Julianne Farnsworth, McNair Law Firm PA, Columbia, SC, for Food Lion Corporate, defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAWKINS, District Judge.

This case came on for a bench trial before this court in May of 1997 in Charleston, South Carolina. The suit was originally filed by Rickey Bryant and his family in March of 1990 on behalf of themselves and a proposed class of similarly situated persons.

In 1991, the complaint was amended to delete several common law claims, and the court granted summary judgment to the defendants on one of four claims arising under the Employee Retirement Income Security Act (ERISA). Following three (3) years of discovery, the court found that the plaintiffs failed to satisfy the prerequisites of Rule 23, Fed.R.Civ.P., and denied class certification on April 2, 1996. Discovery was reopened in the summer of 1996. Plaintiffs dismissed their COBRA claims against the individual defendants, Ketner, Smith and McKinley and, on December 10, 1996, summary judgment was granted to these individual defendants on the claim of discrimination under Section 510 of ERISA. During the trial in May 1997, stipulations of dismissal with prejudice, pursuant to Fed.R.Civ.P. 41, were filed by plaintiffs Pamela Clark Turner (a/k/a Pamela J. Clark), Elizabeth Anne Daniel, Clifford Clark, Bonny L. Arnold, John Mawyer and Carol S. Mawyer, Donald T. Maloney, Pamela Maloney Faucett (a/k/a Pamela K. Maloney), William C. Flockhart and Kenneth R. Barney.

Thus, Rickey and Brenda Bryant, for themselves and their two children, Stephen L. and Genevie W. Bannister, and Scottie Neal Philbeck were the remaining plaintiffs who proceeded to trial against the corporate Food Lion defendants on May 12, 1997. Rickey Bryant, Stephen Bannister and Scottie Philbeck, as former employees of Food Lion, Inc., proceeded on claims of alleged discrimination under Section 510 of ERISA, 29 U.S.C. § 1140, and pretextual termination to induce forfeiture of their vested benefits in the corporation's Profit Sharing Retirement Plan. These plaintiffs, together with their dependents, also proceeded on alleged violations of ERISA under 29 U.S.C. §§ 1161–1166, commonly referred to as "COBRA." Rickey Bryant and Stephen Bannister claim they were wrongfully denied the right to continue their health insurance coverage from the Food Lion Group Benefit Plan after the termination of their employment because Food Lion improperly classified the grounds for their terminations as "gross misconduct." Philbeck claims that he was not given notice of his right to continue his health insurance coverage. Only the Bryants have claims for medical bills that would have been paid as COBRA benefits had they been offered, elected and paid for coverage. The Bannisters and Philbeck merely seek to recover the statutory penalty under 29 U.S.C. § 1132(c) for the alleged failure to give required notice. The Bryants also seek reimbursement of certain medical bills incurred before Rickey Bryant's termination.

At the conclusion of the trial on May 30, 1997, plaintiffs and defendants were instructed to submit to the court proposed Findings of Fact and Conclusions of Law.

### Pending Evidentiary Issues

Before issuing its ruling, however, the court must address three evidentiary issues that remained pending at the conclusion of the trial: (1) Motion by defendant Food Lion, Inc. to exclude the testimony of Moak, Peninger and Vance, which included a motion to exclude portions of the testimony of Ken Decker, or to preserve confi-

dentiality of their deposition testimony; (2) Food Lion, Inc.'s oral motion to exclude the testimony of Margaret Smith on May 12, 1997, and (3) Admissibility of defendants' exhibit 160A.

■ Food Lion, in its filed motion of May 28, 1997, seeks to exclude from evidence the deposition testimony of Michael Moak, Paul Larry Peninger and Randy Vance and portions of the 1996 deposition of Ken Decker. Additionally, on May 14, 1997, Food Lion orally moved to strike the trial testimony of Margaret Smith given on May 12, 1997. It is Food Lion's contention that Moak, Peninger, Vance and Smith were not similarly situated to any of the named plaintiffs because they worked in different locations under different supervisors and that they offered no testimony concerning discharges of the individual plaintiffs or any supervisor responsible for any plaintiff's discharge, nor does this testimony establish a pattern of discriminatory conduct by these supervisors. Pursuant to the ruling by the Fourth Circuit Court of Appeals in *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 276 (4th Cir. 1995), the court agrees with the defendants that the testimony sought to be stricken is not probative of discrimination against any of the named plaintiffs. The court similarly finds that the testimony of Decker regarding sanitation, product dating and working off the clock in stores in Shelby and Kings Mountain, North Carolina, is not relevant to the allegations of these plaintiffs. Therefore, the court grants defendants' motion to exclude from the record those portions of the testimony of Moak, Peninger, Vance and Decker set out in the memorandum in support of its motion to exclude at pages 7 and 8 thereof. Additionally, the court grants defendants' oral motion to exclude the testimony of Margaret Morris Smith on May 12, 1997, on the same grounds. Inasmuch as the court has ruled to strike this testimony on the grounds of irrelevancy, it is unnecessary for it to address the issue on the

asserted ground of untimely notice as to the testimony of Moak, Peninger, Vance and Smith.

As to the admissibility of defendants' exhibit 160A, the court grants the admission of this exhibit as credible evidence and a document created and kept in the ordinary course of Food Lion's business.

Upon hearing the testimony and gauging the credibility of the witnesses, and after reviewing the exhibits, the evidence presented, and the post-trial briefs of the parties, the court makes the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

### A. Corporate Management Structure

1. I find that Food Lion, Inc. operates a large chain of grocery stores, principally in the Southeastern United States, and during the times at issue it had more than 663 stores and 40,000 employees in five states; that it was expanding at the rate of slightly less than 100 stores and more than 5,000 employees, net of employee turnover, per year.

2. I find that at the times of plaintiffs' employment, Food Lion's retail operations were divided into three departments: market (meat, poultry, seafood and, in some stores, deli), perishable (dairy, frozen, produce) and grocery (dry goods and customer service). Each department was headed by a departmental vice-president. Reporting to each respective vice president were a number of regional supervisors who had a number of area supervisors reporting to them. In each store, the department head reported to his department's respective area supervisor. In the grocery department, each store also had a grocery department manager, a customer service manager, an assistant store manager and a store manager.[1] Over all of the store departments was the store manager. The assistant store manager served as manager in the store manager's absence and also

1. McKinley Dep. 55–59; T. Smith Dep. 16–21.

directly supervised the grocery department.[2] The grocery manager reported to the assistant store manager. The customer service manager reported to the store manager.[3]

3. I find that the grocery industry has a relatively high employee turnover rate. During the years the plaintiffs were employed, Food Lion was growing rapidly, and the rapid growth and frequent new store openings created a serious need for experienced, competent employees.[4]

4. I find that in an effort to reduce turnover, Food Lion created several incentives for experienced, trained employees to stay with the company.[5]

B. *The Profit Sharing Plan*

5. I find that Food Lion's Profit Sharing Plan was voluntarily created by Food Lion in 1960 and has been maintained ever since to provide employees with retirement security,[6] and to encourage employees to make a career with Food Lion.[7] I further find that the company pays 100% of the contribution, which for all relevant years was the maximum amount deductible allowed by law—15% of every employee's annual wages.[8] Numerous documents were distributed to employees and posted on employee bulletin boards which emphasized the long term benefits of maintaining employment with Food Lion.[9]

6. I find that prior to December 18, 1988, Food Lion had a 5-to-15 year graduated vesting schedule. None of a participant's Profit Sharing balance was vested until the fifth year, when 25% became vested. Thereafter, the participant's percentage of vested interest increased each year until (s)he became fully vested after 15 years. If a participant separated prior to full vesting, the unvested portion of his/her account remained in the Profit Sharing Plan and was redistributed to the accounts of thousands of participants remaining in the Plan.

7. I find that when the Tax Reform Act of 1986 required that Food Lion change its original 5 to 15 year graduated vesting schedule, the Food Lion Board of Directors was presented with a choice between a 5-year cliff vesting schedule and a 3 to 7 year graduated vesting schedule.[10]

8. I find that in order to become fully vested under the new 5-year cliff-vesting rule, an employee was required to complete at least one hour of service in the 1989 Plan Year, which began December 18, 1988; that any employee whose employment terminated prior to that date would not receive the benefit of the new rule and would forfeit any unvested portion of his/her Profit Sharing Plan.

9. I find that Food Lion selected the 5-year cliff vesting schedule primarily because it was believed it would provide a greater incentive for employees to stay with the company for a long time.[11]

10. I find that the adoption of the 5-year vesting rule was thoroughly publicized both to the employees and to management.

11. I find that because employees with as few as 5 years of service after the end of 1988 would be given the full benefits formerly reserved to employees with 15 years of service, and that they would be able to collect substantial sums from their

2. Pl.Ex. 1,280.

3. Buckley Dep. 38–39.

4. Tr. 1000–23.

5. Ketner Dep. 29, 31–32, 39–40; McKinley Dep. 128–29, Def.Ex. 171, 172 and 176.

6. T. Smith Dep. 86; Ketner Dep. 8, 18–19; McKinley Dep. 128, Helms Dep. 153, 306.

7. Harris Dep.Vol. II, 54–55.

8. Ketner Dep. 21–22.

9. Def.Ex. 171, 172.

10. T. Smith Dep. 83–84.

11. Def.Ex. 165 @ 2–3; T. Smith Dep. 83, 86, 88–89, 91.

Profit Sharing accounts, Food Lion had a legitimate concern that operations could be adversely affected if the new vesting rule triggered a mass exodus of employees in December 1988.[12]

12. I find that, consequently, an extensive communication campaign (including letters from Tom Smith mailed to each participant's home)[13] was developed by Food Lion's Human Resources department to explain the greater value of staying with Food Lion and leaving one's vested benefits in the Profit Sharing Plan.[14]

13. Plaintiffs contend that Food Lion supervisors intentionally terminated long term employees prior to their vesting in the Profit Sharing Plan for the purpose of causing those employees to forfeit their unvested Profit Sharing account balances. Plaintiffs offer as the motive for this scenario the fact that forfeitures created by the termination of a Profit Sharing Plan participant are redistributed among the remaining participants. I find, however, that the amount of forfeitures any one supervisor would receive from the termination of a single participant is *de minimus*, particularly when compared to the time, trouble and expense of hiring and training a replacement. Plaintiffs' expert calculated the average amount added to a mid-level to high-level manager's Profit Sharing account from one average termination of a nonvested plan participant in 1990 to be 39.9 cents.[15]

14. I find that because the plaintiffs had years of service with the company ranging from five to ten years and because all of them had for some periods of their employment held positions as department managers or higher, their account balances were greater than "average." The super-

visors alleged to have pretextually terminated plaintiffs to precipitate forfeitures of plaintiffs' account balances received as a result of the plaintiffs' terminations amounts ranging from $2.66 to $6.20.[16] I find that such small sums of deferred income are not an incentive for a manager to terminate an experienced employee and then have to replace him or her with a new, inexperienced employee.[17] The costs to a manager or supervisor of firing an employee and having to hire and train a replacement are very high and more than outweigh the benefit of the forfeiture.[18]

15. With regard to the claims by the former-employee plaintiffs that the defendants developed a policy of discrimination in administering its Profit Sharing Plan, first, by its choice of the five-year vesting rule over the 3–to–7 year graduated vesting plan; second, by its "hanging on" policy; third, by its 750–Hours Report, and, lastly, by its "rehire" rule, I find as follows:

(a) *Choice of 5–year Vesting Rule.* I find that there in no merit in plaintiffs' argument that Food Lion's choice of the new 5–year vesting schedule was discriminatory. It is unreasonable to believe that Food Lion's intent in adopting the 5–year rule was to get rid of employees and not to encourage employees to stay with the company for a long time. There is nothing in the record to show that the majority of the employees would have received greater benefits had the 3–to–7 year plan been adopted. To the contrary, the record reflects that independent employee benefits consultants recommended the 5–year plan for its simplicity and lower administrative costs.[19] Further, the 5–year vesting schedule is specifically authorized by Con-

12. Buckley Dep. 132–33; Harris Dep.Vol. II, 53–55; Tr. 997.

13. Def.Ex. 171; Pl.Ex. 45.

14. McKinley Dep. 455–57; Def.Ex. 166–170, 173–74.

15. Michelson Dep. 52–53.

16. Def.Ex. 266.

17. Def.Ex. 184, pp. 9–10.

18. Tr. 1455.

19. McKinley Dep. 136–137; Freeman Dep. 78–79, 117–118.

gress. *See* 26 U.S.C.A. § 411(a)(2)(A). As previously found by this court in *Bryant v. Food Lion, Inc.,* 774 F.Supp. 1484, 1495 (D.S.C.1991), adoption of a vesting schedule expressly approved by ERISA is a neutral act. In fact, Food Lion is not obligated to create or maintain any profit-sharing plan. It does so voluntarily on the theory that, by providing employees with retirement security, it establishes an incentive for employees to make their Food Lion employment a career and provides Food Lion with experienced, trained employees.[20] I find that Food Lion adopted the five year vesting schedule for legitimate business reasons, and that the selection of this schedule evidences no intent to discriminate against any Profit Sharing Plan participant.

(b) *"Hanging On" Policy and Zero-Hours Report.* I find that Food Lion supervisors were concerned that employees with over five years service and fully vested in the Profit Sharing Plan would be tempted to resign just to collect the money in those accounts, and Food Lion addressed this concern by publishing materials to persuade employees to stay. There was also the specific concern that some employees would simply "hang on" until they became fully vested and then resign. Plaintiffs contend that Food Lion supervisors intentionally terminated long term employees prior to their vesting in the Profit Sharing Plan for the purpose of causing those employees to forfeit their unvested Profit Sharing account balances, thus increasing the accounts of the other participants. They contend that Smith's memorandums of June 16 and 29 and August 8, 1988,[21] developed into a company policy that employees who were planning to leave did not deserve to receive the substantial benefits that would come with vesting and should not be allowed to remain on the payroll to reach the vesting date. In addition, plaintiffs attribute to this alleged policy the motive that the funds forfeited as a result of early termination provided increased balances of the accounts of the other Profit Sharing participants.

I find that the first two of above memorandums were distributed to the Human Resources Department only and not to store managers or supervisors and that they dealt with specific employees not parties to this suit.[22] I further find that the August 8, 1988, memorandum, which was addressed to all store managers, does not suggest that employees who were close to vesting should be terminated because of their proximity to vesting; instead, the memorandum concerned abuses of the Profit Sharing Plan by a small group of employees who might not be performing viable jobs and were being kept on the payroll simply to satisfy the minimum requirements for vesting, thus being eligible to terminate employment and collect their full Profit Sharing balances.[23] Plaintiffs presented no evidence that any Profit Sharing Plan participant was terminated as a result of Smith's August 8, 1988, memorandum. Food Lion's Senior Vice President of Operations and its various departmental Vice Presidents testified that this memorandum was not used as alleged by the plaintiffs and that management's major concern was how to retain employees.[24] I find that these memorandums do not evidence any discriminatory intent and that Food Lion's statistical evidence is consistent with the company policy to encourage employees to stay employed.

---

20. T. Smith Dep. 83–86; Ketner Dep. 189–119; McKinley Dep. 128–129, 165–166; Helms Dep. 46–47; e.g., Harris Dep.Vol. II, 54–55.

21. Pl.Ex. 25, 27 and 30.

22. T. Smith Dep. 595–597, 618–619; McKinley Dep. 349–353, 434–436.

23. T. Smith Dep. 623–628.

24. Helms Dep. 15–16, 57–58; Adams Dep. 105–106; Buckley Dep. 133; Harris Dep.Vol. II, 53–55.

I further find that the statistical evidence presented[25] does not reflect any significant number of employment terminations prior to the date of full vesting, dispelling the argument that a "policy" existed. I find plaintiffs' argument that the motive for this "policy" was to enhance the benefits of the other Profit Sharing participants, particularly those in supervisory positions, to be without merit. The financial benefit to the individual Profit Sharing participants as the result of forfeiture of the account balances of the non-vested employees upon termination was shown to be de minimus.

Plaintiffs further contend that another printout, referred to as the "Zero Hours Report," was run by Food Lion to identify persons who would quit as soon as they vested and was used to implement the "policy" in Smith's August 8, 1988, memorandum. Plaintiffs presented no evidence, however, that any Profit Sharing Plan participant was terminated as a result of that memorandum or that this report was used to target Profit Sharing Plan participants.

(c) *The 750–Hours Report.* Food Lion regularly distributed computer printouts identified as a 750–1000 hours report. It maintains that, inasmuch as an employee had to work 1000 hours to qualify for a year of vesting credit, this printout allowed managers to schedule an employee the additional hours necessary to meet that vesting requirement. Plaintiffs' contention that managers used this printout to prevent employees from reaching the 1000 hour requirement flies in the face of their argument that managers were seeking additional funds for their own Profit Sharing accounts by way of forfeiture. If an employee did not vest, no forfeiture possibility existed. I find nothing discriminatory in either the issuance or the use of the 750–Hours Report.

(d) *The Rehire Rule.* I find that the Retirement Equity Act of 1984 required ERISA pension plans to be amended so that if a former participant in the plan was rehired within the longer of 5 years or the number of years a participant had participated in the plan, the participant would be restored any amount previously forfeited. 29 U.S.C. § 1052(b)(4). Food Lion's original policy not to rehire separated employees was subsequently changed to permit rehire five years after separation.[26] The plaintiffs concede that they were not affected by the Rehire Rule, but maintain that its existence shows a practice of discriminatory policies by Food Lion; that Food Lion adopted a company policy that absolutely prohibited the rehire of former employees, based solely upon their status as Profit Sharing Plan participants, in order to maintain the benefits forfeited by those employees.

I find that the rehire rule applied to all employees, not just to Profit Sharing Plan participants; this policy also applied to participants who were fully vested in their Profit Sharing benefits and forfeited nothing.

The policy existed to encourage employees to stay with the company.[27] Food Lion was adding 60 to 100 stores per year in the late 1980s. Food Lion's Senior Vice President of Operations, Jerry Helms, explained how this growth affected Food Lion's attitude toward employees:

> I didn't need to be losing people. I needed all the people I could get to staff the stores. So we were trying to keep people from leaving.[28]

The Court believes Helms' explanation and finds it significant, because he was in charge of Food Lion's entire retail operation and familiar with the stores' opera-

---

25. See *The Statistical Evidence, infra,* § C, pp. 19–26.

26. McKinley Dep. 417–418.

27. T. Smith Dep. 376; Tr. 1291; McKinley Dep. 417–418; Helms Dep. 47.

28. Helms Dep. 47.

tions and how supervisors were handling employees.[29]

Plaintiffs' argument that the policy evidences a scheme to enhance forfeitures is also unpersuasive because the policy contained an exception that allowed rehiring a former employee when warranted by operational needs.[30] Those exceptions were based solely on the needs of operations and were not affected by Profit Sharing status.

Jerry Helms reviewed all rehire requests.[31] Helms' memorandums and testimony demonstrate that the exception was integral to the rehire policy.[32] He reviewed each individual situation on its own merits[33] and considered the recommendation of the operations supervisors.[34] If the employee was needed, (s)he was rehired regardless of prior status in the Profit Sharing Plan.[35] Tom Smith and Pat Fulcher also testified that profit-sharing status had no relationship to the eligibility of employees for rehire.[36] Tom Smith also reviewed some rehire requests. His only criteria were company need and potential of the employee; profit-sharing status was not a consideration.[37]

Apparently, some confusion existed among some Human Resources employees as to the rehire policy. The dichotomy between Human Resources personnel's understanding of this policy and Operations' practice is reflected in several memorandums from Jerry Helms, in which he documented his efforts to correct erroneous policy statements emanating from Human Resources.[38] Further, Tom Smith testified that the author of the documents was confused and that the memorandums upon which plaintiffs rely did not accurately state Food Lion's rehire policy.[39] The evidence persuasively demonstrates that profit sharing had nothing to do with rehire decisions. Rather, rehire decisions were based solely on operational needs. Furthermore, Human Resources personnel had no operational authority.[40] Additionally, the Court believes that Tom Smith and Jerry Helms are more reliable sources for what Food Lion's true policy was than the lower level employees whose interpretations (or misinterpretations) are relied upon by plaintiffs. Finally, none of the plaintiffs in this case was affected by the rehire policy.

Therefore, I find that the rehire policy does not evidence any scheme or intent to enhance or retain profit-sharing forfeitures. Moreover, plaintiffs have offered no evidence that the rehire policy had any impact on any plaintiff.

## C. *The Statistical Evidence*

16. Because plaintiffs offered alleged company wide policies and anecdotes from widely dispersed former employees as evidence of discriminatory intent, Food Lion presented company wide statistical evidence. Plaintiffs claim the statistical evidence and the testimony of Food Lion's expert, David Peterson, Ph.D., are not probative of the company's practices or treatment of Bannister, Bryant or Philbeck. While the statistical data do not shed light on what happened to a particular plaintiff, the data provide significant evidence about

**29.** *Id.* @ Dep. 16, 57–58.

**30.** Id. @ Dep. 16, 43–44; McKinley Dep. 423; Tr. 1291–1292.

**31.** Helms Dep. 108–109.

**32.** *Id.* @ 43–44.

**33.** *Id.* @ 44–45.

**34.** *Id.* @ 123.

**35.** *Id.* @ 121–123.

**36.** T. Smith Dep. 398–399; Tr. 1291.

**37.** *Id.* @ 397–399, 401.

**38.** Def.Ex. 222, 223.

**39.** T. Smith Dep. 420–421, 423–424.

**40.** McKinley Dep. 56; Buckley Dep. 44; *see also*, Helms Dep. 303.

the company's intent and motive.[41] Plaintiffs have argued that a discriminatory culture or atmosphere existed at Food Lion during 1986–1990. The Court finds that the statistics effectively refute that claim.

17. I find that the statistics, standing alone, demonstrate the absence of the alleged scheme to prevent vesting. The company wide statistics, analyzed by plaintiffs' and Food Lion's experts, reveal the exact opposite of what plaintiffs have posited. In 1988, when the vesting schedule changed from the old five-to-fifteen year graduated to the new five-year cliff vesting schedule, the alleged incentive for creating forfeitures was at its peak because participants with five to fourteen years of vesting credit became 100% vested on the first day of the 1989 plan year, December 18, 1988.[42] In the critical 1988 plan year, employees who were Profit Sharing Plan participants remained employed by Food Lion in record numbers.[43]

18. I find that the company-wide statistics utilized here are based upon the actual Profit Sharing files of each and every participant in the plan from 1986 through 1990. These 90,000 plus files were produced on computer tape and analyzed by retained experts for both sides.

19. I find that the number of plan participants more than doubled from 1986 to 1990, increasing from 11,739 to 25,139. The number of current plan participants who were 100% vested increased from 81 persons in 1986 to 6,620 persons in 1990, an increase of more than 80–fold.[44]

20. The analysis of plaintiffs' expert, Dr. Michelson, revealed patterns that lead this court to find that, rather than terminating from the Profit Sharing Plan at higher rates as they approached vesting, terminations among Profit Sharing Plan participants declined as they approached vesting.[45]

21. The statistics for each year examined show a pattern of employees remain-

---

**41.** The company wide statistics are clearly admissible on the issue of Food Lion's motive and intent and plaintiffs did not object to this evidence. The Supreme Court has stated:

A *McDonnell Douglas* prima facie showing is not the equivalent of a factual finding of discrimination.... Rather, it is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations. When the prima facie showing is understood in this manner, the employer must be allowed some latitude to introduce evidence which bears on his motive.... The Court of Appeals should ... give ... consideration to the [employer's] proffered statistical proof.

*Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 580, 98 S.Ct. 2943, 2951; 57 L.Ed.2d 957 (1978). *See Lilly v. Harris–Teeter Supermarket,* 720 F.2d 326 (4th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984) (finding comprehensive statistical data far more persuasive indicia of company-wide practices than the isolated anecdotes offered by plaintiffs.)

**42.** Prior to the 1989 plan year, participants became 25% vested upon completing five

years of service and their percentage of vesting increased incrementally until they became 100% vested upon completing fifteen years service. After 1988, participants became 100% vested upon completing five years service. Participants entering the 1988 plan year with 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14 years service all stood to become 100% vested for the first time by completing the year and remaining employed through December 18, 1988. For example, participants who began the 1988 plan year with four years vesting credit, worked 1000 hours during 1988 and remained employed when the new vesting schedule took effect on December 18, 1988 became 100% vested. If they worked at least 1000 hours in 1988 and separated on December 17, 1988, they would have been 25% vested. Participants who began the year with five years credit (and who were 25% vested) and worked 1000 hours in 1988 would have received 30% of their Profit Sharing account balance if they separated on December 17, but 100% if they remained employed until December 18, 1988.

**43.** Tr. 1477–1478.

**44.** Michelson Dep. 29.

**45.** *Id.* @ 32.

ing employed in greater numbers and percentages as they draw closer and closer to full vesting.[46] I find that this is the opposite pattern from what one would expect if Food Lion had the intent to prevent employees from staying long enough to vest.

22. This is strikingly evident in the year 1988, which plaintiffs contend is the critical year because of the change in the vesting schedule. The change in the vesting schedule for Food Lion's Profit Sharing Plan became effective on the first day of the 1989 plan year, December 18, 1988. I find that if Food Lion had devised a scheme to deprive employees of profit-sharing benefits, the greatest incentive for its implementation would have been in 1988 when participants entering the plan year with four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen and fourteen years vesting credit would all vest 100% if they remained employed until December 18, 1988.

23. The rate of retention of participants who entered the 1988 plan year with four or more years of vesting credit was higher than it was in prior years.[47] In fact, plaintiffs' expert admits that employees with five or more years of service in 1988 stayed *longer* than one would have expected them to stay and vested 100%.[48] At the beginning of plan year 1988, 4,269 persons were eligible to vest 100% on December 18, 1988. Of those 4,269 persons, 3,925 (91.9%) remained employed and vested 100%.[49] I find, overall, that the pattern for 1988, relative to the two years before and after, is one in which employees stayed on in greater numbers and percentages.[50] Of the persons who entered the 1988 plan year with four or more years of vesting credit, 1.2% (only 52 of the 4269)

were discharged by the company during that plan year.[51]

24. Food Lion's expert, David Peterson, Ph.D., was a well-qualified witness with a distinguished career which includes teaching and publishing in the field of statistics. He has testified for plaintiffs and for defendants in employment related litigation.[52] His report, introduced without objection, clearly and concisely summarizes the voluminous data analyzed.[53] Dr. Peterson found:

> [R]etention rates are generally higher for employees with more years of vesting credit than for those with fewer. In every plan year, the propensity of unvested participants (those with less than five years of vesting credit) to stay with the Company was consistently greater for participants having more credit toward vesting than for those having less. This pattern is consistent with an employer practice *that does not* force participants to leave employment as they approach full or partial vesting. Indeed, it is the pattern one would expect to see of any employer that pays no heed to employee vesting status when making personnel decisions.
>
> \* \* \* \* \* \*
>
> ... It is clear that as employees get closer to vesting, they have a greater tendency to remain employed and to earn yet another year of vesting credit. This is obviously not a pattern suggesting that this employer tries to force its employees to terminate when they get too close to vesting.
>
> \* \* \* \* \* \*
>
> ... In 1986 and 1987, retention rates generally drifted upwards, each group of participants with an additional year of

46. Tr. 1446.

47. Tr. 1439.

48. Michelson Dep. 81–82.

49. Tr. 1445.

50. Def.Ex. 184.

51. Tr. 1446.

52. *Id.* @ 1431–1433.

53. *Id.* @ 1289, 1290, 1434.

vesting credit having a greater propensity to remain employed with the Company.... In 1988, the pattern for participants with one through four years of vesting credit is similar to those for 1986 and 1987, but the curve for five or more years is somewhat higher than in previous years. It appears that participants entering plan year 1988 with five or more years of vesting credit may have been especially reluctant to leave employment during that plan year.

\* \* \* \* \* \*

... [M]ost of the 1988 groups with four to fourteen years of credit were retained at higher rates than in previous or subsequent years, and ... on balance, people who entered 1988 with the prospect of increasing their vesting percentages as of the end of that plan year did so in higher percentages than in previous or subsequent years....

\* \* \* \* \* \*

In 1989 and 1990, there is a pattern different from that of previous years: among participants entering those years with five or more years of vesting credit, the retention rate drops off sharply.... That is, in 1989 and 1990, people who began the year 100% vested left the company in unusually large numbers.

\* \* \* \* \* \*

Thus the pattern ... is not that the company was losing large numbers of employees just as they were about to vest, but rather, starting in 1989, that it was losing large numbers of employees *just after they vest 100 %.*[54]

25. From all of this data, Dr. Peterson made the following conclusions:

... [T]here is no practical incentive for individual managers to terminate their employees as they approach vesting. Furthermore, because of the complexity of the vesting rules and lack of comprehensive and accessible data, it is doubt-ful that a manager could determine whether an employee was vested, or when he or she might become vested. Finally, there is no statistical evidence to the effect that employees on the verge of vesting were at greater than normal risk of being terminated. Neither in Dr. Michelson's nor my own studies can I find any indication that the Company took any action to keep employees from vesting.[55]

I find Dr. Peterson's testimony and report credible, reliable evidence about the company-wide impact on Profit Sharing Plan participants of all the policies and practices alleged by plaintiffs to be discriminatory or indicative of malevolent intent. I find, therefore, that this evidence is inconsistent with a discriminatory motive.

26. The statistics are persuasive evidence that Food Lion took no action to discourage Profit Sharing Plan participants from vesting. Furthermore, the overwhelming weight of the evidence convinces the Court that Food Lion's policies were intended and in fact operated to encourage participants to remain employed until they vested 100%.

27. This leaves for consideration whether some isolated act of discrimination adversely affected the plaintiffs. For reasons that follow, I find that the plaintiffs' separations were not caused by any discrimination.

28. Class certification was denied because plaintiffs failed to provide any basis for believing that a company wide scheme existed. At trial, plaintiffs' counsel continued to argue the existence of a company-wide scheme, but plaintiffs presented no evidence suggesting any such scheme existed. Plaintiffs offered at trial evidence of the same corporate office memoranda and policies that the court already found did not evidence any discriminatory intent on the part of the individual defendants, Tom Smith, Ralph Ketner and Gene

---

54. Def.Ex. 184, pp. 6–7.

55. Def.Ex. 184, p. 10.

McKinley.[56] I find this evidence fails to create an inference of discriminatory intent.

29. Based on the foregoing, I find that the evidence is persuasive that Food Lion's policies were intended, and in fact operated, to encourage participants in the Profit Sharing Plan to remain employed until they vested 100% and that no discriminatory policies existed to discourage Profit Sharing Plan participants from vesting.

D. *Former Employee Plaintiffs' § 510 Claims.*

30. I find that the former-employee plaintiffs have not presented any credible evidence that their discharges resulted from any discriminatory intent to deprive them of their Profit Sharing benefits.

31. I find that the discharges of Bryant and Bannister were performance based. The court has before it abundant evidence that plaintiffs Bryant and Bannister were familiar with Food Lion's policies and procedures; that they were well aware of their job duties and expectations, that they failed to fulfil those duties, and that they had received prior notice and warning that further refusal to perform the duties of their jobs would result in termination.

*As to Bryant*

32. I find that Bryant was terminated on March 23, 1988, after receiving several constructive advise memorandums (hereinafter "C.A.s") over the months preceding his discharge. The evidence shows that at least as early as December 7, 1987, Sweeney, Bryant's Area Grocery Supervisor, called to Bryant's attention, via C.A.s and checklists, deficiencies in Bryant's performance. Following a visit on December 15, 1987, a C.A. by Sweeney showed Bryant's failure to correct problems noted on the December 7th C.A. Bryant was suspended and the C.A. stated that further violations would result in discharge. The violations were discussed with Bryant, who noted on the C.A. that the store had inadequate personnel. Both Sweeney and Waddell, the Regional Grocery Supervisor who visited on December 12, 1987, and found the store dirty and not blocked, disputed Bryant's assessment that there was insufficient personnel. The record shows that Sweeney again visited the store on March 5th, March 8th, March 15th, and March 22nd, 1988. On each visit he left checklists for Bryant with notations such as "Rick, make this happen," and "2nd request." The store manager, Fudge, initially helped Bryant with attempting to perform the duties set out on the checklists, but was later instructed not to do so. During this March period, Jimmy Hanna, a "floating" assistant manager, was dispatched to the store to assist Bryant for one 50–hour week; then, after an interim of a week, he was again sent for an additional 50–hour week. Hanna's testimony was that everything fell apart during the intervening week. On his visit on March 22nd, Sweeney again found numerous problems, many from the previous checklists, and Bryant was discharged on March 23, 1988. His separation notice reflects that he was discharged for failure to follow his supervisor's instructions.[57]

33. Even though the last evaluation of Bryant, issued a full year prior to his discharge, was not below standard, based on the testimony of Dallas Waddell, his supervisor during most of his tenure with Food Lion,[58] and Jerry Helms,[59] I find that Bryant's performance was sufficiently in-

---

**56.** In opposition to Smith's, Ketner's and McKinley's motion for summary judgment, plaintiffs made the same arguments and submitted the same exhibits about the choice of the vesting schedule and the so-called hangers on policy that they introduced at trial. Plaintiffs' Memorandum of Law in Response to Individual Defendants' Motion for Summary Judgment dated 7/3/96.

**57.** Def.Ex. 73.

**58.** Tr. 999.

**59.** Helms Dep. 211.

consistent as to be deemed "poor." I further find that especially during the months immediately preceding his discharge, he did not carry out his duties as instructed or as expected of an assistant store manager.

34. I further find that Bryant's testimony that he was working unusually long hours during this period is not substantiated by credible evidence.

35. I find that Sweeney had been in Food Lion's employ less than two years and had only one year of vesting credit. He realized only $6.20 from Bryant's forfeiture and left Food Lion one years later, forfeiting 100% of his benefits.

36. I find that Bryant's discharge was based on poor performance [60] and that Sweeney, who was solely responsible for Bryant's discharge, would have had no incentive to discharge a nine-year veteran of Food Lion on a pretextual charge.

*As to Bannister*

37. Bannister was terminated on November 6, 1987. I find that the decision to terminate Bannister was also motivated solely by his poor performance.[61] Murray, Bannister's Area Supervisor, made the decision to terminate Bannister following a visit from the Regional Supervisor, Koehler, during which the perishable department was found to be in poor shape and the milk and dairy cases filthy.

38. I find that in December 1985, July 1986 and August 1987, Bannister was reprimanded for his continuous refusal to perform certain cleaning tasks. One C.A. in August 1987 referenced Bannister's violation of Rule of Conduct #3, which was grounds for immediate discharge. That C.A. stated "absolute refusal to remove drain cover and clean out to prevent water leaking onto the floor in the dairy aisle." [62] Additionally, two other supervisors testified that they had reprimanded him for

failure to clean the milk case. Murray, the Area Perishable Supervisor, made the decision to discharge Bannister in November 1987, thirteen months before the cliff vesting date of December 18, 1988, and while the 15–year graduated schedule was still in effect. Murray was employed by Food Lion in 1986 and began the 1987 plan year with zero years of vesting credit; therefore, he had no Profit Sharing incentive to discharge Bannister.

39. As evidence of alleged discrimination, Bannister claims that his Area Supervisor, Murray, had commented to his Store Manager, Dodd, and Perishable Manager, Jones, that Bannister must be hanging around to get his Profit Sharing. Murray testified that he believed Bannister was merely "hanging around" for his Profit Sharing because Bannister did not do his job or appear to want to do it. He further testified that when confronted by Bannister, he told Bannister that it was his performance—"because you don't want to do what we tell you"—that precipitated his remark.

40. I find that Murray's frustration over Bannister's insubordination is a legitimate explanation for his comment that Bannister "must just be hanging around" to get his Profit Sharing and is not evidence of discriminatory intent.

41. In light of Murray's status as a new Profit Sharing participant, Bannister's obvious refusal to perform duties he knew to be his responsibility, and Bannister's lack of credibility on the stand and in his submissions, I find that Bannister's discharge was not motivated by any intent to deprive him of his Profit Sharing benefits.

42. Bannister testified that he was hired in 1978 to replace someone with four years service who was being targeted for termination to obtain his forfeitures, but this was some ten years prior to the vest-

---

**60.** Indeed, I find Bryant's conduct rose to the level of "gross misconduct." *See, infra,* re COBRA Claims, § E, ¶ 66 @ p. 43.

**61.** *Id.* @ ¶¶ 63–65, pp. 42–43.

**62.** Def.Ex. 15, McKinley Dep. 202.

ing schedule change.[63] He claims he was unfairly demoted in 1982 for leaving his store without permission, but had little money in his Profit Sharing account at that time that would have been forfeited upon termination.[64] He claims that he was "targeted" in 1985 and in the spring and summer of 1986, yet he was not fired.[65] He stated in a handwritten letter dated January 19, 1988, addressed to three Food Lion executives that every time he was written up it was his day off,[66] which the evidence shows was not true. Bannister has given conflicting accounts as to the circumstances surrounding his actual termination, and it was not until after Bannister was fired that he made the claim that his supervisors were harassing him or disciplining him because of his Profit Sharing. I find that much of Bannister's testimony was inconsistent and not credible.

*As to Philbeck*

43. Philbeck's employment at Food Lion ceased on July 1, 1988. I find that the alleged termination of Philbeck was the result of his letter of resignation as grocery manager and that this resignation was not contingent on approval of his request to work as a part-time bagger.

44. Philbeck claims he was fired from a part-time bagger position after having transferred from a full-time manager's position in another department. Mr. Philbeck's testimony, however, was not credible. I find that Philbeck never received approval to transfer to the front end; that although he actually worked six hours that were charged to the front end, he was never classified as a bagger and that the payroll records reflect that he was paid for that time at the hourly rate of his position as grocery manager. The three witnesses that he claimed assured him that his request for transfer had been approved, all gave credible testimony that they knew nothing about such approval. I find further that, although Philbeck's resignation letter claimed that he was quitting in order to attend school, he admitted that he had never applied to any school.

45. I find that the allegations of pretextual termination of Food Lion employee Monto and the pretextual demotion of employee Morgan are without merit and in no way impacted on the termination of Philbeck. Monto was fired by his store manager, McCarty, in consultation with the Regional Market Supervisor, Osborne, for stealing. Morgan resigned; his separation notice, signed by McCarty, reflects that his impending resignation was known prior to the date he became fully vested and that his resignation was not effective until after he became 100% bested; hence, there is no evidence of his being fired for "hanging on to vest." The evidence of Monto's and Morgan's terminations in no way supports Philbeck's claims that he was fired due to discriminatory intent.

46. I further find that the deposition testimony of Harding, Philbeck's Area Supervisor, and Klomp, the acting store manager, is that Philbeck's work as grocery manager had been unsatisfactory, and the deficiencies in his performance were documented in writing in his personnel file.

47. As to Philbeck's argument that he was the victim of discrimination by Food Lion against employees who were attempting to remain on the payroll solely to obtain their Profit Sharing benefits, as allegedly outlined in the Smith August 8th, 1988, memorandum, I find that Smith's memorandum was not written until one month after Philbeck was terminated. Therefore, I find Philbeck's argument lacks credibility.

48. I find that Philbeck has presented insufficient evidence of any intent of Food Lion to discharge him or to cause him to forfeit his Profit Sharing benefits. He admits he resigned as grocery manager;

**63.** Tr. 178.

**64.** Tr. 194–202.

**65.** Tr. 208–209.

**66.** Def.Ex. 18.

he admits he never told anyone he wanted to keep that job if he could not become a bagger, and he admits he never discussed his request to work part-time with anyone having the authority to approve it.

49. In conclusion as to all three plaintiffs' claims, I find that these plaintiffs have presented no credible evidence that their discharges resulted from any discriminatory intent to deprive them of their Profit Sharing benefits. The discharges of Bannister and Bryant were the result of repeated poor performances and their unwillingness to adhere to store policies, and the "discharge" of Philbeck was, in fact, termination of employment as the result of his letter of resignation. It is the court's opinion that these plaintiffs' supervisors had no intent to deprive the plaintiffs of their Profit Sharing benefits. Plaintiffs have failed to carry their burden of proof on the central question of discriminatory intent; thus, their § 510 claims must be dismissed.

E. *As to Plaintiffs' COBRA Claims*

50. The COBRA requirements became effective at Food Lion on October 1, 1986. Insurance department personnel, Food Lion's insurance committee and its human resources department began in the early summer of 1986 to study available information about COBRA, to question the United States Department of Labor and Food Lion's insurance administrator about the meaning of the requirements and to work on a plan for compliance.[67] Food Lion developed a notice procedure that was implemented October 1, 1986 and was in use when the plaintiffs separated.[68] The Court finds that Food Lion made a concerted, good faith effort to develop appropriate notice procedures to comply with COBRA.

51. In response to plaintiffs' claim that Food Lion intentionally failed to comply with COBRA in an effort to avoid the attendant cost, I find that the evidence clearly demonstrates that COBRA compliance was a cost of doing business that was monitored by Food Lion no differently than any other cost of doing business.[69]

52. I find that Food Lion developed and utilized a system that was reasonably calculated to provide notices to qualified employees within the statutory deadline.[70] Food Lion's system was designed and implemented to result in the sending of COBRA letters by first class mail [71] to the last known address of Group Benefit Plan participants who separated for reasons other than discharges classified as gross misconduct.[72] Plaintiffs' expert testified that such a system is deemed by the U.S. Department of Labor to be good faith compliance.[73]

53. Both Bryant and Bannister take issue with the determination by Food Lion's insurance department that their terminations were deemed to be the result of *gross* misconduct, making them ineligible for COBRA notification. Philbeck, who was undisputably eligible for such notification, denies that he received the notification.

---

67. Def.Ex. 113–121, Tr. 1480–1482, 1535.

68. Tr. 1253–1254.

69. Preslar (1992) Dep. 247, 256–259, 332, T. Smith Dep. 637–638, Boone Dep. 53–54.

70. Plaintiffs claimed initially that Food Lion was obligated to offer COBRA coverage to each plaintiff within 14 days of his or her separation. Food Lion contended that it had 44 days from an employee's termination of employment to send a COBRA notice. In its order granting summary judgment to Food Lion on Paul Hawkins' claim, the Court concluded that Food Lion had 44 days to provide

notice. Order, Feb. 7, 1997 at pp. 10–11. *See also, Roberts v. Nat'l Health Corp.*, 963 F.Supp. 512 (D.S.C.1997), aff'd. 133 F.3d 916, 1998 WL 10375 (4th Cir.1998) Plaintiffs have abandoned their contention that Food Lion was obligated to provide notice within 14 days of termination.

71. Tr. 1481.

72. Tr. 1251–1253, 1537, Gaskey Dep. 42–43.

73. Hamburger Dep. 66.

54. I find that Food Lion's a routine system for notifying former employees of their right to continuing coverage under COBRA need not be reiterated in its entirety here. The methodology is undisputed up to the point of (1) the determination by the insurance department of what constitutes gross misconduct, which impacted on both Bryant and Bannister, and (2) the contention by Food Lion that its dependence of an alternative method of notification when its payroll department's computer system crashed was sufficient to prove good faith in its attempt to notify Philbeck.

*Bryant's and Bannister's COBRA Claims*

55. I find that an employee terminated for gross misconduct is not entitled to continued insurance coverage under COBRA. 29 U.S.C. § 1163(2). I find that plaintiffs Bryant and Bannister were terminated for refusal to comply with their supervisor's instructions; that their refusals to comply constituted gross misconduct, and, therefore, they were not entitled to notice or continued coverage under COBRA.

56. I find that none of the sources from whom Food Lion sought advice in developing COBRA procedures, including the U.S. Department of Labor, ever told Food Lion that records should be kept of the reasons for its gross misconduct determinations,[74] and that no records documenting the reasons for gross misconduct determinations as to Bryant and Bannister were kept either by the insurance department or the supervisors who were contacted by that department. Because it is not possible to reconstruct the insurance department's decision making, Food Lion's witnesses concerning the conduct for which Bryant and Bannister were terminated are the same for their COBRA claims as for their § 510 claims.

57. I find that prior to October 1, 1986, when COBRA became effective at Food Lion, Food Lion's insurance department employees earnestly sought assistance in determining how to define gross misconduct.[75] The statute offered none. The United States Department of Labor issued no regulations. Food Lion employees requested advice and were advised that the company would have to develop its own definition, because the Department of Labor had no definition and no one else suggested one.[76] The answer from every source was that Congress had simply left the matter to each employer to determine for itself.[77] It appears that Congress intended each employer to tailor its definition to the needs and exigencies of its own business. This is exactly what Food Lion did.[78]

58. In response to this lack of guidance, Food Lion's insurance department looked to the human resources department to define gross misconduct.[79] The human resources department determined to define gross misconduct (for purposes of COBRA at Food Lion) by using a list of eight rules which Food Lion had previously considered serious enough for immediate discharge without warning.[80] These eight "rules of conduct" had been in effect at Food Lion for many years as Gene McKinley, Food Lion's vice-president of human resources, brought them with him to Food Lion in the 1970s.[81]. Employees were familiar with their existence and managers and supervisors had experience with their application. These rules, developed through years of experience in human re-

---

74. Tr. 1534–1535.

75. Tr. 1480–1483, Def.Ex. 189A–H.

76. Preslar Dep. (1992) 47–48, 229–230.

77. *Id.* @ 229–230.

78. Barnett Dep. 7, McKinley Dep. 201–205, 260, Preslar Dep. (1992) 47–48, 150–154, 185.

79. Tr. 1482, Preslar Dep. (1992) 150–154, 185.

80. McKinley Dep. 200–206.

81. *Id.* @ 201–205, 260.

sources, define certain behavior as so reprehensible in the workplace and so detrimental to the employer's interests as to justify immediate discharge without warning. Thus, the company defined gross misconduct to mean a violation of any of the eight rules of conduct which were already considered sufficient grounds for immediate discharge.[82] I find that this process evidences a good faith effort by Food Lion to comply with COBRA, and to develop a definition of gross misconduct consistent with company needs, rather than an intentionally overbroad or arbitrary definition. Plaintiffs' expert acknowledged that, given proper circumstances, acts falling within the general confines of each of Food Lion's eight rules of conduct could constitute gross misconduct within the meaning of COBRA.[83]

59. I find that the separation of each employee was reviewed individually to determine whether the facts and circumstances warranted a finding of gross misconduct for COBRA purposes. Determination of whether to send a separating health plan participant a COBRA notice begins with the "term code" listed for that participant on the COBRA printout.[84] Separating participants who had a term code indicating they had voluntarily quit are sent COBRA notices.[85] For each separating participant with a term code indicating some reason for separation other than a "voluntary quit" or "no work available," an insurance department employee telephones the employee's manager or supervisor to determine the reasons for and circumstances of the employee's separation.[86] Then the decision of whether to apply the gross misconduct exception was made on the basis of all the facts collected during the telephone call.[87] If the information received during the telephone call indicates that the employee was fired for reasons which constitute gross misconduct, the employee is not sent a COBRA notice, and "no" is written beside that name on the printout.[88] If the insurance department determines that the employee was not fired for gross misconduct, or if the employee's separation resulted from circumstances other than a discharge, the separating participant is sent a COBRA notice. In questionable cases, the employee always received the benefit of the doubt.[89]

60. I find that store personnel and their supervisors were not involved in the decision of whether to offer COBRA. Their role in the COBRA determination was limited to providing facts about the circumstances of the termination to the insurance department.[90] The insurance department then used the information received to determine for itself whether the termination should be classified as gross misconduct or not.[91]

61. Diane Smith, Food Lion's Insurance Supervisor, trained several insurance department employees to perform their COBRA duties. Ms. Smith was routinely available as needed to answer questions and assist them in handling any problems or new situations that arose.[92] Moreover, in administering the gross misconduct exception, all questionable cases resulted in a COBRA notice being sent.[93]

---

82. *Id.* @ 201–205.

83. Hamburger Dep. 85–92.

84. Tr. 1485–1486.

85. Gaskey Dep. 174.

86. Tr. 1485–1488, Gaskey Dep. 24–29.

87. Tr. 1489.

88. Tr. 1486–1489, 1491.

89. Gaskey Dep. 23, D. Smith Dep. 135–136.

90. Tr. 1488–1489.

91. Preslar (1992) Dep. 160–161, Tr. 1488–1490.

92. Gaskey Dep. 20–23

93. *Id.* @ 23, D. Smith Dep. 135–136.

62. Food Lion's Rule of Conduct Number 3 provides for immediate discharge upon an employee's "absolute refusal to comply with the instructions of any supervisor." Dewey Preslar, Food Lion's Director of Risk Management, testified that Rule Number 3 included insubordination,[94] which the court determines clearly covers the conduct of Bryant and Bannister. Plaintiffs suggest that a definition of insubordination without verbal dissent is novel. It is axiomatic that actions speak louder than words.[95] Plaintiffs' COBRA expert, Paul Hamburger, testified that all of Food Lion's Rules of Conduct, including number 3, could constitute gross misconduct.[96]

63. I find that the evidence demonstrates that Stephen Bannister had been employed with Food Lion for some 9½ years and was well familiar with his duties and responsibilities as a dairy clerk, including his obligation to clean the milk case every Monday, and that he had been warned repeatedly that failure to obey his supervisors' instructions in this regard would result in discharge. I find that the evidence further demonstrates that his repeated refusals to do so were inexcusable. Given his years of experience in the grocery business and in the perishable department, and given the repeated warnings about the importance of following Food Lion's cleaning policies, he knew well the importance of cleanliness in his department. He had also been previously reprimanded in writing for violation of Food Lion's Rule of Conduct number three (absolute refusal to comply with a supervisor's instructions) less than three months earlier, and therefore also knew of its importance to Food Lion.

64. I find that Bannister's testimony contained several inconsistent statements as to the reason for his discharge.[97] Having observed Bannister's demeanor and re-

viewing his testimony, the court finds much of Bannister's testimony lacks credibility.

65. Based on the above, I find Bannister was terminated for his gross misconduct in his absolute refusal to comply with his supervisor's instructions.

66. I find that Bryant was also appropriately denied COBRA for gross misconduct. The reasons for his discharge are explained in the testimony of Tom Sweeney, Dallas Waddell, David Fudge and Jimmy Hanna. The evidence demonstrates that Bryant had been employed by Food Lion for 9 years and was well aware of the duties and expectations of his job. The evidence further demonstrates that he repeatedly refused to obey direct orders and instructions from his store manager and his area grocery supervisor. Several of the assigned tasks related to cleanliness, which is of obvious importance to Food Lion. He had plenty of time, opportunity and assistance from others available to him to accomplish the tasks he was ordered to do. The conclusion from the evidence is inescapable that his failures to comply with Fudge's and Sweeney's instructions were willful and intentional insubordination and constituted absolute refusal to comply with his supervisors' instructions. I find, therefore, that Bryant's conduct falls within the meaning of Food Lion's Rule No. 3 and that he was terminated for gross misconduct.

*Philbeck's COBRA Notice Claim*

67. It is uncontested that Philbeck was entitled to COBRA notification and, if he elected, COBRA benefits. Philbeck contends, however, that Food Lion failed to provide him notice of his COBRA rights upon the termination of his employment. Food Lion contends proper notice was given, even though Food Lion's nor-

94. Preslar Dep. 227–228.

95. *Cf.* Matthew 7:21–29.

96. Hamburger Dep. 92.

97. Def.Ex. 17, 18 and 19, Tr. 278–280, 283–284, Pl.Ex. 276.

mal procedure for notice had to be altered due to a computer failure.

68. A copy of Philbeck's COBRA letter in Food Lion's file contains his name and social security number but no address.[98] Pat Fulcher, Food Lion's Payroll Manager, and Diane Smith, Insurance Coordinator, testified as to Food Lion's computer failure in July 1988, stating that the system that normally produced the COBRA printout and printed address labels failed at the time Philbeck's separation notice was processed.[99] The insurance clerk reported the problem to Food Lion's computer department and an alternate report was immediately run.[100] As a result, the insurance clerk received a printout of every employee who separated that week.[101] She determined which separated employees had health insurance, and then followed normal procedures for determining those who should be sent COBRA notices. Because the labels could not be printed that week, the insurance clerk had to look up each address on the computer system and manually address the envelopes.[102]

69. Pat Fulcher explained the payroll department's maintenance of employee personnel records. Once an employee provides an address to the company, it is transmitted to payroll and entered into the computer system. No other department can change an address, but other departments (such as the insurance department) that have need of employee addresses have access to the information as soon as the payroll department inputs it into the system.[103] The computer system had only one address for Philbeck, the last address that he provided the company.[104]

70. In the summer of 1988, Philbeck was living at 7300 Bryn Athen Way in Raleigh, North Carolina. Letters from Food Lion in June and August, 1988, before and after the date of his July 29, 1988 COBRA letter, were addressed to and received by him at that address. Although Philbeck claims he never received the notice, he admits that no reason exists for his not having received the COBRA letter if it was sent to that address.[105]

71. Diane Smith, Food Lion's insurance supervisor who supervised the insurance clerk and who was responsible for the administration of Food Lion's COBRA notice system, explained the procedure used to process the COBRA letters that week, including the additional steps necessitated by the computer system failure. She testified that the insurance clerk looked the addresses up on the computer and manually addressed the letters that week.[106] Diane Smith identified the handwritten notations on that printout as being Toni Gaskey's handwriting.[107] Gaskey's note on the printout documents that the letters were sent to each name checked on the printout, and that each letter was sent to the address on the computer.[108] The printout that was kept by Food Lion, along with copies of the COBRA letters themselves, is Food Lion's record of the persons to whom letters were sent.[109]

72. Philbeck's name appears on the alternate printout, the status report for the week ending July 23, 1988.[110] Ms. Gaskey determined that he was entitled to a COBRA notice. The printout has a check by

**98.** Def.Ex. 159.

**99.** Tr. 1263–1264, 1496.

**100.** Def.Ex. 161, 160B, Tr. 1264–1267.

**101.** Tr. 1264–1265, 1498.

**102.** Tr. 1263–1267, 1271–1274, 1496–1499.

**103.** Tr. 1262–1263, 1265.

**104.** Tr. 1251–1253, 1537, Gaskey Dep. 42–43.

**105.** Tr. 78–80.

**106.** Tr. 1497–1499.

**107.** Tr. 1496–1497.

**108.** Tr. 1496–1497, Def.Ex. 160A, 160B.

**109.** Tr. 1499, 1525–1529.

**110.** Def.Ex. 160A, Tr. 1267, 1497–1498.

his name indicating he was sent a letter, and Food Lion's files contain a copy of a letter with his name and social security number on it.[111] The evidence demonstrates that Food Lion sent the letter in accordance with its normal established procedure, as modified that week to deal with the computer system failure.[112] The letter is dated July 29, 1988, just one day after Ms. Gaskey was notified of the computer failure.[113]

73. Food Lion introduced copies of 28 other COBRA letters dated the same day as Philbeck's letter.[114] Each bears the person's name and social security number. Two of the letters also have attached envelopes reflecting that they were returned by the U.S. Postal Service as undeliverable.[115] Philbeck's letter was not returned by the Postal Service.[116]

74. I find that the plaintiffs also presented a witness, Anthony Blackwell, whose testimony provides further support of Food Lion's alternative method of COBRA notification: Blackwell's separation notice was received by Food Lion's payroll department the same week as Philbeck's separation notice; his COBRA letter is dated the same day as Philbeck's, July 29, 1988,[117] does not on its face contain an address, but, nonetheless, was received by Blackwell in an envelope bearing his address.[118]

75. I find that there is no evidence that any negligence caused the computer failure and no evidence that the insurance department employee who processed Philbeck's COBRA letter was not careful and meticulous in the performance of her duties. Although the plaintiffs speculate that a clerical mistake could possibly have been made in addressing the envelope,

there is no evidence of such an error. Philbeck's full name and social security number on the letter are accurate.[119]

76. I find that the evidence shows that Food Lion made a good faith attempt to comply with COBRA's notice requirements, and the court is convinced that Food Lion caused notice to be sent to Philbeck by first class mail at his last known address. Philbeck's claim that he did not receive the COBRA letter is insufficient to overcome Food Lion's evidence that the notice was mailed to him, in a good faith manner reasonably calculated to reach him. *See, Roberts v. Nat'l Health Corp.*, 963 F.Supp. 512 (D.S.C.1997), aff'd. 133 F.3d 916, 1998 WL 10375 (4th Cir. 1998).

### F. *Plaintiffs' Post–Termination Damages; Bryant Family's Group Benefit Claims*

77. In light of the above rulings, I find no damages due to the former-employee plaintiffs on their § 510 claims or on their post-termination COBRA claims. The court need only address the pre-termination medical claims of the plaintiff Bryant and his family.

78. I find that prior to his termination Rickey Bryant, his wife and two daughters were covered by the Food Lion, Inc. Group Benefit Plan. Rickey, Brenda, Stephanie and Chrystal Bryant assert claims against the Group Benefit Plan for medical bills incurred prior to Rickey Bryant's termination. Copies of bills or medical claim forms purporting to represent these claims were introduced through Pl.Ex. 143, 146 and 147. Defendant entered multiple objections as to these documents.

**111.** Tr.Def.Ex. 159, Tr. 1496–1499, 1526.

**112.** Def.Ex. 159, 160, 160B, 161, Tr. 1496–1499.

**113.** Def.Ex. 159, 161.

**114.** Def.Ex. 238–265.

**115.** Def.Ex. 238, 239, Tr. 1499–1502.

**116.** Tr. 1528.

**117.** Def.Ex. 233.

**118.** Tr. 594–596.

**119.** *Cf.* Def.Ex. 159 and Pl.Ex. 231.

79. I find that the testimony of Brenda Bryant as to these claims lacked clarity and consistency and, therefore, lacked credibility. I find Mrs. Bryant's testimony, specifically as to the affect that any denial of coverage had on the eye condition suffered by her daughter, Stephanie, was proven at trial to be untruthful in several fundamental respects, thereby casting doubt on the veracity of her testimony in general.

80. Mr. Bryant admitted in his testimony that some of the medical bills included in Ex. 143, 146 and 147 were incurred due to personal injuries sustained in automobile collisions with third parties. He admitted he settled these accident claims and received payment for the medical bills but then did not pay them.[120] Nonetheless, Mr. Bryant seeks payment from Food Lion. I find that plaintiffs offered no evidence that the Group Benefit Plan was obligated to pay medical bills relating to injuries caused by third parties. An endorsement to Food Lion's Group Benefits Program, entitled "Acts of Third Parties," states:

> A special provision applies when you or a Dependent covered under the plan is injured through the act or omission of another person. When this happens, the Employer will advance the benefits under the plan only on condition that you or a Dependent agrees in writing:
> (1) To repay the Employer in full any sums advanced to cover such expenses from the judgement or settlement you or a Dependent receives; and
> (2) To provide the Employer with a lien to repay the Employer to the extent of medical benefits advanced by the Employee. The lien may be filed with the person whose act caused the injuries, his agent, the court or the attorney of the person covered under the plan.[121]

The Bryants presented no evidence that they complied with either of these conditions.

81. I find that Brenda Bryant's claim for pre-termination medical bills lists seven (7) billings which resulted from personal injuries sustained as the result of the actions of third parties.[122]

82. I find that some four (4) of these claims[123] were never identified in discovery[124] and, therefore, will not be considered by the court.

83. I find that the Brenda Bryant has failed to prove that seven (7) of these claims[125] were ever made and/or that they had not been paid, or, if denied, that they were not denied for other sufficient reasons, such as the Bryants failure to provide adequate information to the insurer.[126]

84. I find that of the six (6) claims which have been made on behalf of the Bryants' daughter, Chrystal, for pre-termination medical expenses, two (2)[127] were not identified in discovery and will not be considered by the court.

85. I find that there is no proof that the other four claims were ever submitted

---

120. Tr. 493–494.

121. Pl.Ex. 51 @ p. 51.

122. Pl.Ex. 143 (10–15, 19).

123. *Id.* (1, 4, 6, 9). Three requests for a claim form were made by Food Lion as to # 4, but this claim was denied because the information was not received from the Bryants, Def. Ex. 78, and there is no proof that this claim has not been paid. There is also no proof that the claim shown as # 9 was ever submitted and that it, too, has not been paid.

124. Def.Ex. 236–237.

125. Pl.Ex. 143 (3, 5, 7–8, 16–18).

126. Def.Ex. 78.

127. Pl.Ex. 146 (3, 6). The record shows that two requests for claim form were made by Food Lion as to # 3, but claim was denied as incomplete. The bill shown at # 6 was applied to the deductible. Def.Ex. 78.

or that they have not been paid.[128]

86. The Bryants submitted a listing of twelve (12) bills as pre-termination claims on behalf of their daughter, Stephanie. I find that half of these charges were not identified in discovery [129] and will not be considered by the court.

87. Of the remaining six claims, one (1) was related to an automobile accident, *supra*, there is no proof that claims were submitted or that the bills remain unpaid on two (2) billings, and three (3) claims were denied by Food Lion as "incomplete" because of a lack of response by the Bryants to requests by Food Lion for submission of claim forms.[130]

88. Mrs. Bryant testified that the providers, not she, submitted the claim forms on these medical expenses, and she has no first hand knowledge of what was submitted.[131] The Bryants failed to present any evidence showing they ever completed any claim forms or submitted them to Food Lion's plan administrator. Moreover, on many of the claim forms, for example Pl. Ex. 144, pp. 1, 4, no insurance information is noted, and some claims show on their face to be duplicates. I find no proof or convincing testimony that numerous requests by Food Lion's Plan Administrator, for additional information needed to process some of the claims, was furnished by the Bryants and these claims were appropriately denied as "incomplete."

89. As a result of the failure of the Bryants to substantiate and/or document these claims, I find that there is no proof that any of the claims for pre-termination medical services were properly submitted for payment, improperly denied, paid for by the Bryants or remain unpaid at this time; therefore, I find that Food Lion is not liable to the Bryants on these Group Benefit Plan claims.

128. Pl.Ex. 146 (1, 2, 4, 5).

129. Pl.Ex. 147 (2, 3, 9–12).

## II. CONCLUSIONS OF LAW

1. *Section 510 of ERISA requires specific intent to deprive plaintiffs of their Profit Sharing benefits.*

To establish a § 510 claim in an individual disparate treatment case, an aggrieved employee must prove "*specific intent* by defendants to interfere with his pension rights." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 238 (4th Cir.1991).

The *Conkwright* court explained:

'ERISA does not guarantee every employee a job until he or she has fully vested into a company's benefit plan.' ... Rather, ERISA guarantees that no employee will be terminated where the purpose of the discharge is the interference with one's pension rights. Consequently, it is necessary to separate the firings which have an incidental, albeit important, effect on an employee's pension rights from the actionable firings, in which the effect of the firing on the employer's pension obligation was a motivating factor in the firing decision. Otherwise, an employee could sue under § 510 for being negligently terminated, and that goes too far to vindicate the pension rights of employees. An effective way of making the necessary separation is to require plaintiffs to demonstrate specific intent on the part of the employer to interfere with the employee's pension rights.

*Id.* at 238–39 (quoting *Dister v. Continental Group, Inc.*, 859 F.2d 1108 (2d Cir. 1988)). After years of discovery, the plaintiffs have failed to prove that their terminations were motivated by the specific intent of Food Lion or any Food Lion supervisor to interfere with any of their Profit Sharing benefits. Therefore, their § 510 claims fail.

130. *Id.* (1), (4, 8), (5–7), respectively.

131. Tr. 677.

*2. Plaintiffs' circumstantial evidence fails to establish a prima facie case under the McDonnell Douglas test.*

■ In attempting to prove their cases, the plaintiffs may present direct or circumstantial evidence under ordinary methods of proof that Food Lion acted with specific intent to interfere with their attainment of full vesting in the Profit Sharing Plan. Lacking that proof however, the plaintiffs may rely upon the *McDonnell Douglas* scheme to prove their cases under Section 510. *Conkwright,* 933 F.2d at 239 (holding that, "[t]he *McDonnell Douglas* scheme of presumptions and shifting burdens of production is appropriate in the context of discriminatory discharge claims brought under § 510 of ERISA"). *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). All of the plaintiffs in this case relied upon the *McDonnell Douglas* scheme to attempt to prove their claims.

■ Under that scheme, a plaintiff first must establish a *prima facie* case of discrimination. *See, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To establish a *prima facie* case of discriminatory discharge under ERISA, the plaintiff must show that he or she: (1) was in a protected class; (2) was satisfactorily performing his job; and (3) suffered adversely from the employer's employment decision "under circumstances that give rise to an inference of discrimination." *Henson v. Liggett Group, Inc.,* 61 F.3d 270, 277 (4th Cir. 1995); *Conkwright,* 933 F.2d at 234; *Ennis v. Nat'l Assoc. of Business and Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995). If a plaintiff successfully establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. If the employer successfully articulates a legitimate, nondiscriminatory reason, the burden of production shifts back to the plaintiff to show **both** that the employer's asserted reasons for its actions were false **and** that inten-

tional discrimination was the actual reason for the employer's adverse employment decisions. *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2749. Mere rejection of the employer's proffered reasons for its actions will not carry the day for the plaintiff. It always remains the plaintiff's burden to persuade the trier of fact that the employer intentionally discriminated against him. *Id.*

### A. Stephen Bannister

Stephen Bannister was clearly within the class of persons protected by Section 510 at the time he was terminated from Food Lion. Therefore, he has proved the first element of a *prima facie* case. His claim fails, however, as to whether he was meeting Food Lion's legitimate expectations at the time of his termination. *Conkwright,* 933 F.2d at 234. As set forth above, Mr. Bannister received several constructive advice memorandums beginning almost two years prior to his termination in addition to verbal warnings that he was not performing his duties. Indeed, the only evidence which Mr. Bannister has offered that he was satisfactorily performing his duties at the time of his termination is his own evaluation of his work. In the light of the plentiful evidence that Bannister was not doing his job, Bannister's self-evaluation is suspect. Further, the Court has found him not to be a credible witness.

Bannister and the other plaintiffs have failed to prove that their terminations occurred under circumstances which give rise to an inference that Food Lion acted with specific intent to interfere with their vesting. To attempt to prove this element, plaintiffs' counsel asserted at trial that anecdotes from persons employed at stores remote from plaintiffs are somehow probative of issues relating to the plaintiffs. Plaintiffs' contention is similar to an argument that the Fifth Circuit Court of Appeals rejected in *Mooney v. Aramco Servs.*

*Co.*, 54 F.3d 1207 (5th Cir.1995).[132] Even if plaintiffs had a pattern and practice claim,[133] anecdotal evidence concerning employees who worked in different stores or with different supervisors is not admissible. Without a pattern or practice claim, it clearly has no probative value.[134]

■ In disparate treatment discrimination cases, comparisons among employees are valid only if the employees are similarly situated. *See, e.g., Myers v. Hose*, 50 F.3d 278, 284 (4th Cir.1995). Plaintiffs have argued that persons in different states, regions and departments, working for different sets of supervisors at different points in time, are similarly situated to themselves. Plaintiffs have also argued that statements and actions of supervisors not involved in plaintiffs' terminations, working in different departments, stores, areas and regions, are somehow probative of plaintiffs' claims. This argument is not supported by existing law in the Fourth Circuit or elsewhere. *See Crosswhite v. E.I. Dupont de Nemours & Co.*, No. 89–2915, 1990 WL 15686 (4th Cir. Feb. 12, 1990); *Williams v. Sonoco Prods. Co.*, 33 Fair Empl.Prac.Cas. (BNA) 1200, 1205, 1982 WL 423 (D.S.C.1982) (DeVitt, J.), *aff'd in part and remanded on other grounds*, 738 F.2d 433 (4th Cir.1984); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992) (noting that to be deemed "similarly-situated," the individuals must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct). Because Section 510 requires specific intent, (not mere disparate treatment) another employee must have the same supervisor as a plaintiff before that other employee could be considered a similarly situated person whose treatment would provide a valid basis for comparison. Evidence of how a different supervisor treated another employee simply is not probative of whether the plaintiff's supervisor acted with discriminatory intent. *Henson*, 61 F.3d at 276.

■ The parties identified in class discovery responses over 1000 witnesses. From among these witnesses, plaintiffs called as witnesses a woman from western Virginia, a man from Georgia (whose Food Lion employment began after all plaintiffs had already separated), several

---

**132.** In *Mooney*, Aramco Services Company terminated the employment of 85 managerial and skilled employees, who subsequently sued the company claiming that their discharges constituted a pattern and practice of age discrimination. At trial, six employees sought to introduce comparative, anecdotal evidence involving the company's treatment of other employees. The trial court refused to allow such evidence. The Fifth Circuit agreed, holding that:

> *Testimony of anecdotal witnesses with different supervisors, working in different parts of the company was simply too attenuated to relate to this threshold issue.* Because of their dissimilarity to the Trial Plaintiffs, instead of providing testimony of a company-wide pattern or practice, the excluded anecdotal witnesses' testimony would simply have been evidence of 'sporadic and isolated' occurrences. Because the witnesses were not relevant to the Trial Plaintiffs' burden, we find no abuse of discretion in their exclusion.

*Id.* at 1221 (emphasis added).

**133.** While the class claims were pending, plaintiffs contended that Food Lion had engaged in a pattern and practice of discrimination. After the Court denied their claims for class certification, plaintiffs abandoned their pattern and practice claim.

**134.** As the court found in its April 2, 1996 Order Denying Plaintiffs' Motion for Class Certification at p. 6, the plaintiffs had engaged in "full discovery" on the issue of "the existence of the alleged company-wide scheme, pattern or practice of discriminating against Profit Sharing Plan participants." The plaintiffs had submitted to the court depositions and affidavits from 152 Food Lion employees from 84 different stores in 47 of the company's areas and eight of its regions. In its April 2, 1996 Order, the court assumed all of this evidence to be true, yet found the totality of it insufficient to create even an inference that discrimination was the company's standard practice. Rather, the court concluded that all of the plaintiffs' anecdotal evidence showed nothing but isolated examples, not any company-wide pattern or practice. (April 2, 1996 Order @ 28.)

men from South Carolina and North Carolina, and submitted deposition designations from a number of witnesses from around the Southeastern United States. Only a handful of these witnesses worked with any plaintiff. These witnesses offered anecdotes about their own personal employment situations and described alleged conversations they had, or more often overheard. Much of the testimony was hearsay, and much of it merely conveyed the witnesses' interpretations of comments supposedly made by some Food Lion manager or supervisor. Many of these supervisors were not even supervisors of any plaintiff and most did not supervise any plaintiff at the time of his separation. Such evidence is as a matter of law not probative of any plaintiff's claim. As the Fourth Circuit stated in *Henson*, such statements are indicative of discrimination only if they relate to a particular plaintiff or the circumstances of his discharge. 61 F.3d at 276. In rejecting Henson's claim that Liggett management's discussions of replacing older workers with younger ones was insufficient to indicate discrimination against her, the Fourth Circuit concluded that such statements are "probative evidence only when they directly relate to a particular person, employment decision, or pattern of decision making." *Henson*, 61 F.3d at 276.

Plaintiffs offered evidence of only one statement that meets the *Henson* standard. That is the statement by Bannister's Area Supervisor, Joe Murray, that Bannister must just be hanging around to get his Profit Sharing. Murray testified that the statement was related to Bannister's performance and the court believes his explanation. Furthermore, Food Lion offered credible evidence from Murray and several other witnesses of legitimate, nondiscriminatory reasons for Bannister's discharge. Plaintiffs have failed to convince the court that those reasons were untrue or pretextual. The court rejects plaintiff's theory that Murray fired Bannister to deprive him of his Profit Sharing.

Food Lion objected to the testimony of a number of plaintiffs' witnesses on the ground that they had not been identified by any plaintiff as witnesses.[135] Most but not all of them had been identified as putative class members during the class phase of discovery. Plaintiffs admit, however, that they were not identified by *plaintiffs* in answers to interrogatories.[136] Plaintiffs argued that they had no obligation to identify their witnesses to Food Lion until the week before trial when the Local Civil Rules of this district require identification of witnesses expected to be used at trial.[137] The Court cannot fathom how plaintiffs could think that their trial witnesses could come from any source other than persons previously identified in discovery as persons having knowledge of the plaintiffs' claims.

In 1990, Food Lion served each plaintiff with an interrogatory calling for identification of every person with knowledge of the facts of his case. After years of focus on the class issues, and denial of class certification, discovery was reopened in May 1996 on the individual claims. If plaintiffs had supplemented their interrogatories answers then, and identified the witnesses at issue, Food Lion would have had the opportunity to depose them. Plaintiffs' failure to respond to Food Lion's interrogatories deprived defendants of that opportunity. Plaintiffs hid the identity of their witnesses until the eve of trial, in contravention of the letter and spirit of the Federal Rules of Civil Procedure and the Local Rules of this district. No claim was made that these were newly discovered witnesses who could not have been timely identified. In fairness to defendants, their

---

**135.** The witnesses whose testimony is covered by Food Lion's motion to exclude are: Michael Moak, Paul Larry Peninger and Randy Vance.

**136.** Tr. 554–562.

**137.** Tr. 559.

testimony is excluded. A scheduling order "is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Forstmann v. Culp*, 114 F.R.D. 83, 85 (M.D.N.C.1987) (quoting *Gestetner Corp. v. Case Equipment Co.*, 108 F.R.D. 138, 141 (D.Me. 1985)). *See also*, in *Admiral Theatre Corp. v. Douglas Theatre*, 585 F.2d 877 (8th Cir.1978) (the power of the trial court to exclude exhibits and witnesses not disclosed in compliance with its discovery and pretrial orders is essential to the judicial management of a complex case); *Geiserman v. MacDonald*, 893 F.2d 787 (5th Cir.1990).[138]

Bannister's burden is to prove a *prima facie* case by a preponderance of the evidence in order to shift the burden of production to the defendant. *Henson*, 61 F.3d at 274. The preponderance of the evidence here is that Food Lion has a powerful interest in retaining qualified employees and that employees who do their jobs vest in their Profit Sharing accounts. In this court's opinion, Bannister has not proved a *prima facie* case.

Even assuming that he has proved such a case, however, Food Lion has clearly articulated, through the introduction of admissible evidence, a legitimate non-discriminatory reason for Bannister's termination—that he refused to do his job after repeated warnings. Bannister insists that this reason is pretextual, but the court does not agree. The only evidence that Bannister has offered of pretext is that of Joe Murray—which has been rejected by this court.

In summary, Bannister has failed to carry his burden of proof that his termination was the result of Food Lion's specific intent to interfere with his vesting in his Profit Sharing benefits.

### B. Rickey Bryant

The analysis with respect to Bryant is very similar to that of Bannister. He was clearly within the class of protected persons at the time he was terminated. However, as set forth in the statement of facts above, his ability to show that he was meeting his employer's expectations is refuted by the overwhelming evidence that he was not. For the reasons set forth above about the overwhelming numbers of Food Lion employees who have vested, the circumstances surrounding Bryant's termination do not give rise to an inference that he was terminated to interfere with his vesting in the Food Lion Profit Sharing Plan. He was fired by Tom Sweeney, who was a relatively new Profit Sharing Plan participant who had no Profit Sharing incentive to discharge Bryant. Indeed, Sweeney voluntarily left Food Lion the next year and forfeited 100% of his Profit Sharing.

Further, Food Lion presented a legitimate non-discriminatory reason for its termination of Bryant—that he had repeatedly refused to perform his duties. Bryant suggests no reason why that explanation should be viewed as a pretext for an unlawful termination. Bryant has failed to prove his termination was the result of Food Lion's specific intent to deprive him of his Profit Sharing.

ERISA does not guarantee employment until an employee vests. The evidence presented to this court demonstrates that Food Lion terminated Bannister and

---

138. Nevertheless, even if the Court denied Food Lion's motion to exclude these witnesses' testimony, it would make no difference in the result because the Court does not find the testimony in question to support the plaintiffs' claims in this case. The statistical evidence is overwhelming that Food Lion employees who do their jobs and choose to remain employed at Food Lion vest in the Profit Sharing Plan. Also, at the time of Bannister's termination, he was a full 13 months away from full vesting. Second Amended Complaint, ¶ 48. He was discharged by a supervisor who was a brand new Profit Sharing Plan participant with no Profit Sharing incentive to discharge Bannister. Therefore, no circumstances appear which suggest that Food Lion's termination of Bannister was motivated by a specific intent to prevent him from vesting in his Profit Sharing account.

Bryant for legitimate, non-discriminatory reasons and there is no credible evidence suggesting otherwise.

### C. Scottie Philbeck

■ Scottie Philbeck originally alleged that he was terminated. Second Amended Complaint, ¶ 21. However, he has admitted that, in fact, he quit his job at Food Lion. His claim is that he sought to become a part-time bagger so that he could remain and vest in the Profit Sharing Plan, but that Food Lion denied his request with the specific intent of interfering with his opportunity to vest.

Philbeck relies upon the formulation of a *prima facie* case set forth in *Henson* for persons who claim to have been denied employment based upon discrimination. The elements of that claim are that (1) the plaintiff is in the protected class, (2) he was qualified for the position that he sought, and (3) that he was not offered the position under circumstances giving rise to an inference of discrimination. *Henson*, 61 F.3d at 277. In *Henson*, however, the plaintiff involuntarily lost her job at the defendant company and sought to compete for another position. *Id.* at 273; *see also, Dister*, 859 F.2d at 1110. Philbeck's case is problematic for the simple reason that he voluntarily quit his job. By all accounts, he would have vested had he remained in his job for the remainder of his vesting period.

■ Philbeck, therefore, is not within the protected class. Section 510 applies only to "participants" and "beneficiaries." In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that the statutory term "participant," as applied in 29 U.S.C. § 1002(7), means either "employees in, or reasonably expected to be in, currently covered employment," or former employees who "have ... a reasonable expectation of returning to covered employment or who have a 'colorable claim' to vested benefits." *Firestone*, 489 U.S. at 117, 109 S.Ct. at 958 (citations

omitted). The Court further held that "in order to establish that he or she 'may become eligible' to receive benefits, 'a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future.' " *Id.* at 117–18, 109 S.Ct. at 958.

■ In the wake of the *Firestone* decision, several courts became concerned that applying the Supreme Court's definition literally, an employer could fire an employee and then claim that the employee was not a "participant" for purposes of a claim. *Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1221–22 (5th Cir.1992), *cert. denied*, 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992); *Mullins v. Pfizer, Inc.*, 23 F.3d 663 (2d Cir.1994). These courts, therefore, developed a "but for" test—an employee may bring a claim under § 510 of ERISA if he can show that but for the employer's wrongful action he would have been a participant entitled to bring a suit. *See, e.g., Mullins*, 23 F.3d at 667.

Philbeck was not fired. He was not coerced into quitting. He was not misled to quit his job. Philbeck could have retained his position until his benefits vested, but he chose not to do so. Therefore, he voluntarily removed himself from the Profit Sharing Plan and does not have standing to sue as a participant. He cannot prove that Food Lion's actions amount to discrimination causing him to lose vested benefits. *Stiltner v. Beretta USA Corp.*, 74 F.3d 1473, 1484 (4th Cir.) (en banc), *cert. denied*, 519 U.S. 810, 117 S.Ct. 54, 136 L.Ed.2d 18 (1996). The court has found nothing in the circumstances surrounding his separation that gives rise to a credible inference of discrimination. Accordingly, Philbeck's § 510 claim fails.

### 3. COBRA's notice requirement is triggered by a "qualifying event."

The requirement that an employer send a COBRA letter is triggered by the occurrence of a "qualifying event." 29 U.S.C. § 1163. The statute enumerates six quali-

fying events (e.g. death, divorce), but only one is applicable to the plaintiffs in this case:

(2) the termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment;

29 U.S.C.A. § 1163(2). Coverage may end for a number of other reasons, *e.g.* an insured deciding to opt out of the health plan, or failure to pay a premium. However, only qualifying events delineated in the statute trigger the COBRA notice requirement.

4. *Food Lion's COBRA procedures constitute a good faith attempt to notify qualified beneficiaries.*

COBRA is silent on the manner in which the notice of eligibility for continuation coverage must be communicated. 29 U.S.C. § 1166(a)(2). Courts considering this issue have determined that a good faith attempt to comply with a reasonable interpretation of the notice requirement is sufficient. *E.g., Roberts v. Nat'l Health Corp.,* 963 F.Supp. 512 (D.S.C.1997), aff'd. 133 F.3d 916, 1998 WL 10375 (4th Cir. 1998); *DiSabatino v. DiSabatino Bros., Inc.,* 894 F.Supp. 810 (D.Del.1995); *Conery v. Bath Assocs.,* 803 F.Supp. 1388 (N.D.Ind.1992); *see Phillips v. Riverside,* 796 F.Supp. 403 (E.D.Ark.1992); *Jachim v. KUTV Inc.,* 783 F.Supp. 1328 (D.Utah 1992); *Truesdale v. Pac. Holding Co.,* 778 F.Supp. 77 (D.D.C.1991); *Dehner v. Kansas City Southern Indus., Inc.,* 713 F.Supp. 1397 (D.Kan.1989).

Thus, the precise issue raised by the notice requirements of 29 U.S.C. § 1166(a)(2) is not whether the plaintiffs received notice, but whether Food Lion caused notice to be sent in a good faith manner reasonably calculated to reach the plaintiffs. *See Conery v. Bath Assocs.,* 803 F.Supp. at 1398. An employer generally complies with 29 U.S.C. § 1166(a)(2) by sending notice by first class mail to the last known address of an employee. *Id.; Roberts,* 963 F.Supp. at 514; *Jachim,* 783 F.Supp. at 1334.

In this case, Food Lion's records reflect that it developed in good faith a procedure that caused a COBRA letter to be sent to Philbeck by first class mail at his last known address. The evidence also reflects that Food Lion developed in good faith a definition of gross misconduct that included the reasons for which Bannister and Bryant were terminated. This evidence demonstrates a concerted good faith effort to comply with 29 U.S.C. § 1166(a). These procedures resulted in the sending of a notice by first class mail to the last known address of Philbeck, the only former employee who was entitled to COBRA coverage and, as such, Food Lion satisfied its notice obligation under 29 U.S.C. § 1166(a).

5. *Scope of review of gross misconduct determinations is de novo.*

 Food Lion's determinations that Bryant and Bannister were terminated for gross misconduct are subject to *de novo* review. Because Food Lion has no records documenting or explaining the reasons for the decisions to deny them COBRA, it is necessary to look at the evidence of why they were fired to determine *de novo* whether the grounds for their discharges constitute gross misconduct within the meaning of 29 U.S.C. § 1163(2). *See Karby v. Standard Prods.,* 1992 WL 333931 (D.S.C.1992), *Avina v. Texas Pig Stands, Inc.,* 1991 WL 458848 (W.D.Tex.1991). *See also Quesinberry v. Life Ins. Co.,* 987 F.2d 1017, 1026–27 (4th Cir.1993).

6. *Definition of "gross misconduct" within meaning of COBRA.*

If an employee was fired for conduct that is gross misconduct, then Food Lion had no obligation to offer COBRA. 29 U.S.C.A. § 1163(2) (West Supp.1993).

 There is no generally applicable or binding judicial interpretation of the definition of gross misconduct. In *Paris v. F. Korbel & Bros., Inc.,* 751 F.Supp. 834 (N.D.Cal.1990), the court adopted the Cali-

fornia standard of "misconduct" for unemployment insurance to define gross misconduct. That definition reads in part:

> carelessness or negligence of such a degree or recurrence as ... to show an intentional and substantial disregard of the employer's interests or the employees [sic] duties and obligations to his employer.

*Id.* at 838. In this district, gross misconduct for management employees has been defined as " 'substantial deviation from the high standards and obligations of a managerial employee that would indicate that said employee cannot be entrusted with his management duties without danger to the employer.' " *Karby v. Standard Prods. Co.,* 1992 WL 333931 at *6 (D.S.C. June 22, 1992), (Judge Joseph F. Anderson, Jr.).

■ In light of prior warnings about the very conduct for which he was discharged, Bryant's flagrant, repeated insubordination and his position as assistant store manager, the grounds for his termination fit the *Karby v. Standard Prods.* definition. The tasks that he was asked to perform are ones he knew were important to Food Lion. They related to cleanliness of the store and product level, both of which are significant to the company and to its customers. This court is satisfied that this insubordinate conduct of Bryant falls within the definition of gross misconduct articulated in *Karby v. Standard Prods.* and constitutes gross misconduct within the meaning of 29 U.S.C. § 1163(2). Accordingly, Bryant had no "qualifying event" and neither he nor his dependents were entitled to continue his health insurance coverage after his termination.

■ Stephen Bannister was also fired for absolute refusal to comply with his supervisor's instructions. He was not a manager so the *Karby* definition is not applicable. However, given Bannister's years of experience in the perishable department, the importance of cleaning to the operation of his department, and the fact that he had specifically been warned repeatedly, verbally and in writing, about his failure to clean the dairy case each week and to obey supervisor's orders, the circumstances of his discharge satisfy the *Paris v. Korbel Bros.* definition of gross misconduct. Given the circumstances, Bannister's discharge constitutes gross misconduct within the meaning of 29 U.S.C. § 1163(2). Accordingly, Bannister's termination from Food Lion did not result in a qualifying event. Therefore, neither he nor Genevie Bannister had any entitlement to continue his health insurance coverage.

### 7. *Bryant Family's COBRA medical claims.*

The Bryant family, *i.e.,* Rickey B. and Brenda S. Bryant individually and as guardians *ad litem* for Chrystal R. and Stephanie Windham Bryant, have failed to prove that they were wrongfully denied COBRA coverage; therefore, they are not entitled to damages.

### 8. *Bryant Family's pre-termination medical claims.*

The Bryants further seek benefits under Food Lion's health insurance plan for medical bills allegedly incurred prior to Bryant's termination. As shown above, they failed to prove any such claims and, therefore, are due no relief from the Group Benefit Plan.

### 9. *Plaintiffs' claims for COBRA penalties are barred by the statute of limitations.*

■ Each of the plaintiffs claims entitlement to the statutory penalty of $100.00 per day from 44 days after their termination until the date of judgment. This is the only relief sought under COBRA by the Bannisters and Philbeck. The plaintiffs' claims for penalties under 29 U.S.C. § 1132(c) are barred by the one year statute of limitations in S.C.Code Ann. § 15–3–570, which the Fourth Circuit has held applies to a penalty claim brought in South Carolina under 29 U.S.C. § 1132(c). *See, Underwood v. Fluor Daniel, Inc.,* No. 95–3036, 1997 WL 33123, at *6 (4th Cir.1997).

The Fourth Circuit has held that for a COBRA penalty claim brought in the District of South Carolina, pursuant to 29 U.S.C. § 1132(c)(1), the applicable statute of limitations is the one year provision for penalties codified at S.C.Code Ann. § 15–3–570 (1977). *See, Underwood,* 1997 WL 33123, at *5. The plaintiffs contend that the Fourth Circuit applied the wrong South Carolina statute of limitations in *Underwood* and that this Court should apply instead S.C.Code Ann. § 15–3–540. The statute on which plaintiffs rely was neither cited nor discussed in *Underwood.* The Fourth Circuit explicitly held that § 15–3–570 applied to a COBRA penalty claim brought in South Carolina. Plaintiffs have offered no reason for this Court to reach a different conclusion.

■ The penalty period begins on the forty-fifth day after the employee/participant's termination. 29 U.S.C. § 1132(c)(1). The participants are presumed to have knowledge of these statutory timelines.[139] Therefore, even under the discovery rule[140] the accrual date for the penalty should be at the most the forty-fifth day after the participant is terminated.[141] The plaintiffs' claims were not filed within one year of when the claims accrued. Therefore, their claims for COBRA penalties are barred by § 15–3–570 for failure to file them timely.

10. *Beneficiaries' claims for lack of notice.*

■ Four of the plaintiffs are not former employees but beneficiaries of former Group Benefit Plan participants.[142] The Fourth Circuit held, in *Underwood,* that a spouse who is entitled to COBRA coverage is entitled to notice of his/her right to continued coverage. However, in the case of an employee who is terminated for gross misconduct, there is no qualifying event and the former employees' beneficiaries are not entitled to a COBRA notice or COBRA continuation coverage. *See* 29 U.S.C. § 1163 and 29 U.S.C. § 1161(a). Rickey Bryant and Stephen Bannister were terminated for gross misconduct, so no qualifying events occurred when they were terminated. Consequently, their beneficiaries[143] had no entitlement to COBRA and were due no notice. Further,

139. The plaintiffs are charged with constructive notice of the law as stated in ERISA and COBRA. *James v. Beaufort County Bd. of Educ.,* 348 F.Supp. 711, 715 (E.D.N.C.1971) *aff'd* 465 F.2d 477 (4th Cir.1972) (employees charged with knowledge of North Carolina statutory contract law.); *Gregory v. Gregory,* 292 S.C. 587, 358 S.E.2d 144 (Ct.App.1987), (husband's petition to set aside family court decree because of unanticipated financial ramifications of federal statute (Central Intelligence Agency's Spouse's Retirement Equity Act of 1982) was dismissed because he was presumed to know the law).

140. Federal law determines the accrual date of a statute of limitations in ERISA cases even though state law is the basis for the statute of limitations applied. *See Michigan United Food & Com. Workers v. Muir Co.,* 992 F.2d 594, 597 (6th Cir.1993). In *Underwood* the Court "assume[d], for the sake of argument, that the discovery rule would apply to such actions." 1997 WL 33123. However, the Fourth Circuit specifically declined to "ascertain the precise accrual date of the claim at issue." *Id.* at *6.

141. Each of the employee/participants certainly knows the date he was terminated and therefore was aware of the occurrence of the qualifying event that entitled or allegedly entitled him to COBRA coverage. Each of the plaintiffs who is a beneficiary became aware of her spouse's separation from Food Lion employment at the time it occurred. Tr. 237. Therefore, each of the beneficiary plaintiffs is also deemed to know of the occurrence of the qualifying event at the time it occurred.

142. These are Brenda, Chrystal and Stephanie Bryant and Genevie Bannister.

143. Stephanie and Chrystal Bryant also claim an entitlement to penalties for lack of notice. These claims fail, because they had no independent right to notice separate from their mother's notice right. The statute specifically provides that notice to the qualified beneficiary who is the spouse of the covered employee is treated as notice to all other qualified beneficiaries residing with that spouse at the time the notification is made, 29 U.S.C.A. § 1166(c). Therefore, the Bryant's children, Stephanie and Chrystal, would have no independent entitlement to notice or penalty.

because Genevie Bannister had group coverage from her employer, she was not entitled to COBRA and, therefore, was not due a notice, even if Stephen Bannister had a qualifying event.

For the foregoing reasons, it is

ORDERED, that plaintiffs' claims are denied. Judgment shall be entered for the defendants on all claims of all plaintiffs.

AND IT IS SO ORDERED.